Our next case is Sutton v. The Medical Protective Company. Mr. Rickheimer? Ms. Rickheimer. I'm sorry. I'm sorry. I'm sorry. Did I pronounce it right? I just got the wrong gender. I'm sorry. I apologize. We're pleased to hear from you. Thank you, Judge King. May it please the Court. Gabriela Rickheimer from Troutman Sanders. It is my pleasure to represent the Medical Protective Company of Fort Wayne, Indiana on this appeal. This appeal raises some important legal questions that, in my client's view, were decided contrary to South Carolina black-letter law as well as to authority from this Court and led to a trial that was not only unnecessary given the relevant facts being undisputed but was conducted in a highly unusual way from the perspective of my client, the medical protective. Let me ask you this question before we go too far down the road. We see in the record, or at least the briefing, that there's a high-low agreement. Does that affect our jurisdiction and or is the matter moot as to MedPro? Absolutely not, Your Honor. Let me clarify which question I'm answering. The issue is very much ripe and properly before the Court, the coverage issues in this case, and they are most certainly not moot because the high-low agreement essentially . . . Is the case settled? No. The underlying case is pending. It is stayed. As to MedPro? As to . . . Well, MedPro's not a party to anything besides this coverage action. Does MedPro have a high-low agreement with somebody? With the Moores. The parents of the . . . Yeah, correct. The parents of the injured child. And what the high-low agreement does is base . . . But the underlying case, just to be clear, the underlying case remains pending. It's stayed. Depending on how this appeal is decided, we'll determine how that underlying case proceeds. MedPro has made that high-low agreement on behalf of Dr. Sutton. Correct. It was done . . . Dr. Sutton has an agreement with the Moores. No, the agreement . . . I mean, I'll be honest with you, Your Honors, this was unusual. I think not something I'd done before and something that we did not take on lightly. But the situation my client was in, as well as Dr. Sutton, was that after the trial before Judge Gergel, that the underlying case was going to proceed. And it was a . . . As Your Honors might be aware from the record, it was a case that would have . . . where the plaintiff would be seeking a large amount of damages. And, I mean, from the time of the coverage action to this argument, we're talking about two years. And so, from our client's perspective, both for our client and for Dr. Sutton, we believed it was important to secure a continued stay in that underlying case, so that the determination of coverage in this case, in effect, will determine how the underlying case will proceed. Is the high-low agreement contingent on whether you win or lose here? Yes. I mean, without divulging too much, because it is a confidential settlement, but, essentially, if MedPro owes coverage at the end of the day, if Your Honors affirmed Judge Gergel and MedPro owes coverage, that's when that triggers the high. If Your Honor reverses Judge Gergel, then, where, essentially, completely turns it around so that First Professionals owes coverage, well, then it will be First Professionals' duty will resume as to Dr. Sutton. The case will resume. If there's a finding of no coverage, that's where the low comes in. So, in the probably not impossible but unlikely event that there's a finding of no coverage, so, in other words, if there's no coverage under the medical protective policy because the express conditions precedent to coverage in the insuring agreement were not met, which is our primary appellate issue on appeal, if Your Honors agree with us there but then also affirm Judge Gergel as to the finding that was made in favor of First Professionals, that would be a no coverage situation on the part of Dr. Sutton. Again, requires rulings from Your Honors from this court. In each scenario, it requires rulings on coverage from this court. It will determine how the underlying case will proceed, but it will proceed in one direction or another depending on how Your Honors rule. That's why we call it a high low. I've not honestly done one in the context of an appeal, but I'm extremely comfortable that we've done what we needed to do to both protect our client from potential excess exposure, protect Dr. Sutton from personal exposure, and yet allow this appeal to proceed so that I, on behalf of my client, can come before this court and explain to you what we believe were significant errors of law committed by Judge Gergel and effectively a rewriting of the medical protective policy. It's been, from the day this verdict was rendered against our client, extremely important to be before this court upholding the language in the ensuring agreement of the medical protective policy and ensuring that it gets a fair reading and a fair treatment. Was this high low agreement entered into post-trial? Correct, after the verdict. So tell us in plain language, in Article III verbiage, why this appeal is not moot. We understand everything you said up until now, but just a simple declarative statement of why this case is not moot, because on the face of it, it does appear that you've settled the dispute. Well, first of all, it's not moot because it is fully contingent on how this court rules. See, that's the problem. It's not contingent on how we rule. It's how we rule may determine how the tort claim proceeds. But tell us why you haven't settled this case, this coverage case. Oh, we have not settled this coverage case because we can't settle. In order to settle this coverage case, the coverage issues are still ripe. They're still in dispute. But they're only in dispute in the sense that you lose less depending on how we rule. It's a significant amount of money, Your Honor. We're not talking here diversity jurisdiction. We're talking whether we have a live case of controversy. That's what we're asking about. Absolutely, Your Honor. It's not statutory. It's whether there's really a genuine dispute here. Well, there absolutely is a genuine dispute, Your Honor. I mean, the status quo of the dispute hasn't changed. As far as our settlement with the Moors, the Hilo agreement does not change. There's no way to bet. You're hedged. And it's like going to the casino. You all just bet on the outcome of how we're going to rule on this case. Respectfully, Judge King, I think that's not an accurate description of what . . . It's not a bet. It's not a hedge. What it is, is a way . . . Well, you've got a low. You've got a high and a low, depending on how we rule. I believe . . . We didn't brief this to the court specifically, but my understanding is that . . . It's been briefed. All we know is that one of the briefs mentions this Hilo agreement, but we have never seen it, and that's one of the reasons, I guess, we have to ask . . . Absolutely. Because we have an obligation to assure ourselves of jurisdiction. I understand that. I understand that completely, Your Honor. The Hilo agreements are valid agreements. Typically, they're entered into before a trial. You all can make all the agreements you want. The question is whether you impact our jurisdiction. We have to decide. We have to deal with that first and foremost. Right, Your Honor. The Hilo agreement we entered into post-verdict, I believe, is no different functionally than a Hilo agreement that's entered into before trial, where the outcome of the . . . Maybe if you want to call it a bet or hedging a bet, they're not common, but they're not unusual. I believe, if Your Honors . . . I'd be happy to brief this after the argument, just maybe a short brief on this particular issue. Yeah, I had one. When I was on the district court, I had one where the high was $60,000 and the low was $20,000, and I dismissed the case because diversity requires $75,000 in controversy, and these lawyers had come in and done a very nice job for their clients. But in doing so, they deprived me of jurisdiction. Well, that's a great . . . I'm sorry. Go ahead. But here, we're not talking about diversity jurisdiction. I have little doubt that whatever you folks have agreed to, it satisfies diversity jurisdiction. I'm sure you're talking about more than $75,000 in a med mal case. Correct. But the question here is Article III. Is there a real case of controversy that our decision will be anything other than an advisory opinion? Well, it will not be an advisory opinion. If Dr. Sutton has some coverage, no matter how we rule, it looks like an advisory opinion. Well, Your Honor, but which coverage does she have? That's the question. No, but that's been the premise of this entire case, not from day one. Day one, the case was first professionals suing for declaratory judgment against Dr. Sutton. Dr. Sutton then brought in . . . At this point, the case is only about the cost of defense, if that's what you were alluding to. Well, no. This case is not yet about indemnity. Well, no. Because the tort claim hasn't been resolved. That's correct, Your Honor. Except we don't know that. But, Your Honor, that is the controversy, is which coverage. And that hasn't changed. What do you mean, which coverage? I mean, in other words . . . Indemnity versus cost of defense? No, no, no. Which coverage, whether it was medical protective or first professionals. Which company? Which company. Whose insurance policy is triggered here? That's better stated, Judge King, better stated than I did. I thought, depending on how we rule here, there wouldn't be any. No. I mean, well, I think it's theoretically . . . You say there's no MedPro coverage, and then they're saying there's no, what you call it, FPIC coverage. So, you could rule there's no coverage. You could rule that way, theoretically possible. Although, the doctor kept . . . had policies all the time. There were babies. But you've identified now, Judge King, several situations that could result from this appeal. They're all ripe before the court. I mean, it's hard for me to say what is the Article III. It hasn't changed from the inception of this case. And, Judge Davis, to clarify, it is duty to defend at this point because the underlying case hasn't proceeded. But there's no . . . I think it'd be fair to say that there's no coverage issues other than the trigger of coverage issue, whether one of these policies is triggered. So, ultimately, it's going to be a question of indemnity. If there's a settlement or judgment against . . . And so, at the inception of this case, Dr. Sutton was being defended by first professionals. Following Judge Gergel's ruling below, tender was then made to Medical Protective. We then had to assume the duty to defend. And it was in that context that we were able to reach an agreement with the Moores to stay the case, not render it moot. Where's the underlying case? Is that in Judge Gergel's court? No, it's in . . . I couldn't tell you the exact court. It's in state court in South Carolina. South Carolina. Correct. Correct. So, that case is definitely not moot. The outcome of this appeal will determine what happens in the case going forward. Will Medical Protective defend that case? Will first professionals defend that case? Or, if there's a no coverage situation, then the underlying case will be over. That's when the low will step in. In this case, there's your brief, and there's nobody defending Judge Gergel. Your Honor, I'm going to point out really two things. There's no requirement for appellees to submit briefs, so certainly it's not impossible to decide a case without an appellee's brief. For reasons that are unknown to me, the plaintiffs appeared below, and were active in the case. The underlying plaintiffs, and by that I mean the Moors, they certainly had the right. There was no reason they couldn't. That's not part of our agreement. There was no reason they couldn't come into court and file a brief. They did not. I don't know why they did not. To be candid, because they have a lot of money at stake, depending on how your Honors rules. So, the absence of an appellee's brief does not render the case moot. It makes it a little bit different. You have the benefit of the record. We did put in the appendix to make it easy, the underlying briefs submitted below, and candidly, the reasons on which Judge Gergel both first held the trial, and then reached the legal conclusions he did, were based on issues that, frankly, were not briefed below by any of the parties. And so, I'm not sure, again, the posture of this case hasn't changed. And so, your Honors absolutely can rule without an appellee's brief on these issues. And if I could address them with the brief time I have left in this portion of the argument, it's not difficult. They're not controversial issues. We submit that Judge Gergel made a fundamental error law in both holding the trial and then the findings he reached after the trial. The error was to take the medical protective policy, take that insuring agreement, take the insuring agreement between medical protective and Dr. Sutton said will provide coverage for potential claims if they're reported to the company and if you provide reasonably obtainable information. You're saying Judge Gergel didn't have a right to ascertain the facts. Well, the facts that were the relevant facts, I believe, under the appropriate legal standard, were not in dispute. Let me just walk you through this briefly. He thought they were in dispute. And he held a hearing and tried to define what the facts were. He cited them, but I've never, it's hard to imagine that you could say that the judge can't figure out what the facts are if he needs to that are in controversy. The only fact that- He disagreed with you on which facts were pertinent. Correct. The fact he saw as dispositive is whether she made the- He wanted to decept your facts. The other side wanted to decept theirs. No, I think that's, Judge King, respectfully- He heard, what, four witnesses at a hearing is what he did. He had a hearing and he heard four witnesses at least. He had two live, I believe there were only two live witnesses. He heard two live witnesses and he submitted a deposition testimony. Right. There was one fact that Judge Gergel focused on in the case below and that was whether or not Dr. Sutton made the phone call. There was no, but you have to, here's where I think this- She testified that she did and he believed her. He believed her against, he took her uncorroborated that she made the phone call. But he's entitled to believe a witness. He's the fact finder and he's entitled to believe a witness. But that's where, Your Honor, I think the focus of this appeal is on the insuring agreement whereas the focus of Judge Gergel was not on the insuring agreement. The insuring agreement- She said she made a phone call to you. Right, and we had no record. But let me step back, Judge King, I only have a minute and a half left here and focus- I don't like the way that he conducted the hearing. You said he asked too many questions. Well, I think he asked- It was a bench trial or a hearing before the court. The court can ask all the questions it wants. Well, Your Honor, there are limits and that's why we cited to you the Crandall case. The court has a lot of discretion. You're not going to get anywhere, I don't think, I know you're not with me, telling me that a district court can't ask questions at a bench trial. Your Honor, let me, in the minute I have left, I want to focus- You're there to be prejudiced. I want to focus you on what I think is the most fundamental, and frankly this was the focus of our appeal, the insuring agreement. The insuring agreement of the medical protective policy was completely ignored, it was tortured, it was rewritten, it was written out of the policy. I want to focus you on two things in the insuring agreement. Potential claim, it has a definition in the policy. The definition of the policy is the insured reasonably believes an incident could give rise to a claim. The insured reasonably believes an incident could give rise to a claim. The insured's testimony before trial, at trial, unequivocal, uncontradicted was that she did not believe she reported a potential claim. But it's an objective test, isn't it? Well, no, there's a subjective component to it that was never- But it's an objective test, isn't it? But the first principle is, did she believe a claim could be made? The answer to that from her own testimony was no. That's the end- It's both objective and subjective. She has to believe- Your argument amounts to a contention that Judge Gergel, having decided to believe part of her testimony, was obliged, as a matter of law, to believe all of her- or to either believe or disbelieve all of her testimony, which, of course, that runs you into a wall of about 400 years of jurisprudence, right? Because a fact finder is free to accept or reject any portion of a witness' testimony. Judge Gergel never addressed the potential claim definition in the policy. That's the most- That's the basic bargain between Medical Protective and Dr. Sutton. The most basic bargain was, we'll provide coverage for a potential claim if you report it, in keeping with the insuring agreement of the policy. He did not address any of that. He focused on, did she make a phone call? He never focused on the- He, in fact, never even mentioned the definition of potential claim. If you don't have a potential claim, which is defined as an incident which the insured reasonably believes could give rise to a claim, which the insured reasonably believes- The reasonable is objective, Judge Davis, but believes is- But there's also subjective. You can't just look at her- You can't assign to her a belief that she said she did not have, and that's the error- You also can't treat her as if she's a lawyer. I don't think we are- That's a lawyer's lingo. We're treating her like she's an insured. We're treating her like she's insured under South Carolina law. South Carolina- She was concerned enough with that letter to pick up the phone and call and read the letter to you. She had that concern. She was concerned with having that letter, that inquiry about the Moore boy from a lawyer- No, I'm going to- To pick up the phone and call and read the letter. The letter was not about the boy. The letter referred to Amy Moore. Her testimony- Amy Moore, all right. Who she didn't remember- We know what the contents of the phone call were because she said, I read the letter. That's what I mean. She read the letter to the person on the other end of the phone, and Judge Gergel so found. That's the fact that we have. Now, that's a clear error. And we do argue that in the brief. I don't- I believe I'm over to- We've taken a lot of the time here. It's a high-low agreement because we're concerned with jurisdiction, too. I'll give you a couple more minutes. Let me step back because I think here's what I'm concerned that this court is going to miss. It's the same thing that Judge Gergel missed. There's an- First principles. This is a claims-made-and-reported policy. It's a policy that is written into the bargain that there must be a report of a potential claim. Under South Carolina law, black-letter South Carolina law, it's the duty of the court to give effect to the insuring agreement, the basic insuring agreement with the insured. So we're not treating the insured like a lawyer. We're treating her like an insured. We're saying, as appropriate under South Carolina law, if you want to invoke coverage under our policy, you have to meet the conditions set forth in the insuring agreement. And here there's not- Nothing that Judge Gergel found is in keeping with the actual language of the insuring agreement. So I'll read- He got it wrong in what you want us to say, a potential claim to mean an incident which the insured reasonably believes will result in a claim for damages. That's correct. And then you can't read that potential claim definition without also reading the rest of the insuring agreement, which then goes on to say that if the insured has come to such a belief, then it's incumbent on the insured to provide a report to Medical Protective, including all reasonably obtainable information. And then it lists what reasonably obtainable information would be. Your argument, to my mind, you want a doctor, a physician, to say, yeah, I thought there was a likely claim, which means I thought I did something wrong. And I don't think very many doctors, like very many lawyers for that matter, are going to say in the context of this kind of situation, yeah, I saw a lawsuit coming. I mean, human nature being what it is, that's why it's an objective test. So she may well have been in denial, air quotes, if you will. No, I don't think this is a claim. I didn't do anything wrong. I don't even remember who these people are. I don't remember what happened on March, whatever it was, four years ago. That's why we use an objective test. And so I have difficulty with your argument that the district judge swung and missed at this. I think the district judge fully understood what was going on here. Well, Your Honor, but the district court skipped. I mean, literally skipped over the definition of potential claim, which requires these. It says she picked up the phone and called and read the letter. Why would anybody do that? Why would you call your insurance company? You get this letter, which is like a red flag. But she did not see it as a red flag, Judge Davis. Well, her testimony six years later is that, no, I didn't see it as a red flag. But nobody was there to ask her what she was thinking when she picked up the phone four years after the boy's birth. Nobody knows what she was thinking at that moment. She doesn't even know what she was thinking at that moment. She knows it was serious enough to pick up the phone, according to Judge Gergel's finding, and call her insurance company. Your Honor, I think what I want to focus on in the limited time that I have is, again, this is a claims made in report. You're about out of time. I know. If I could have one more. I'm going to give you two more minutes. Okay, thank you, Your Honor. This is a claims made in reported policy. We cite cases from multiple jurisdictions, multiple other circuit courts that have gone through and looked at not just the timing of notice, but the content of notice. And they're cited in our brief cases that say over and over again that it's incumbent on the insured to make the report. It's incumbent on the insured to comply with the insuring agreement because to do otherwise converts claims made in reported coverage into occurrence coverage, which is exactly what happened here. The letter does not give rise to a claim or a potential claim, that St. Francis letter, that neither asserted a claim against her. It didn't say anything other than an attorney requested medical records. There's nothing about that letter that is either a claim or a potential claim. What would make it a potential claim under the policy is two things. One, she- Did your man say if he had gotten that information, he would have followed up on it and gotten the files and investigated it? He absolutely did. It's a credit to Mr. Coste. He's a diligent claim handler. But that you can't take his testimony and medical protective's helpful business practices as a reason to transform the policy into something it was never intended to be. So that's why when you look at cases, all the cases that we cite in our briefs, they say it's incumbent on the insured to make the report detailed. So there's really two things going on. One, the insured appreciates that there's a potential claim against her, not that she did something wrong, but that she could be sued. And two, reports it to the insurer in a way that the insurer can then not just do the investigation and do the work for her. That's not what the policy says. So what Judge Gergel did fundamentally and the error that we are urging this court to correct is look at the policy, look at the policy language, enforce the policy language. And I'll close just by reading. This is from a very recent case that after we briefed from South Carolina Supreme Court. Bell versus Progressive Insurance, 757 Southeast 2nd, 399. South Carolina courts have a long, and by the way, this was a uninsured motorist coverage case, which has a lot of more public policy implications than malpractice insurance. South Carolina courts have a long history of formalistic interpretation with respect to all contracts, and have repeatedly held that the insurance policies are subject to all general rules of contract construction. What I would encourage the court to do, since my time is up, is look at the insuring agreement, look at the definition of potential claim, and look at the insured's repeated disclaimer that she reported a potential claim. And we cite in our brief cases that say, if the insured disclaims, as she did here. And by the way, Judge Davis, it wasn't just contemporary, it's not just six years later. When she submitted her application for insurance to first professionals, she didn't say either that she was subject to a potential claim or reported a potential claim some nine or ten months later. So you have not just her in trial saying, I didn't intend to report a potential claim. You also have a more contemporaneous assertion on her part in the first professional's application, that she was not aware of any potential claims. That disclaimer is fatal, and we cite numerous cases in our brief that find that to be true. So if I could have just a few minutes for reserve for rebuttal. Let's give somebody else a chance. Okay, thank you, your honors. Mr. Cofalis? Cofalis, yes. I'd be pleased to hear from you, sir. Thank you, and may it please the Court, I am George Cofalis, and I represent Kirsten Sutton, the doctor. I was the one that negotiated the HILO agreement, and let me explain how it came about. Initially, Dr. Sutton had no quarrel with Judge Gergel's order against MedPro, and she had no intent to appeal. She felt that FPIC should be the one to have coverage in this case, because from her standpoint, she had no reason to believe that there was a medical incident to report, and there was no evidence that was seduced, no expert evidence that was put in, that she should have known that there was a medical incident. She felt that it was FPIC's responsibility, but she was satisfied with the result because she had coverage. Judge Gergel had said that MedPro was going to have coverage, and she was fine. The problem came up when MedPro gave its notice of intent to appeal, because if MedPro appealed its case and the ruling as to FPIC remained in effect, and if MedPro appealed and won, then Dr. Sutton could be left without coverage. So she was forced then to appeal the FPIC verdict. And if you lose your appeal and she wins her appeal, you don't have any coverage. That's correct. That's what happened. There's a question mark there. Thank you. As we saw it at the time, she had no choice but to appeal. But Dr. Sutton had two problems at the time. The one was temporarily solved by Judge Gergel's order, and that is she didn't have coverage. Judge Gergel now said she had coverage. But the second problem, which to my mind was more important in the long run, was that the Moors sought an excess judgment against her. She only had a million dollars' worth of coverage, and the Moors wanted more than a million dollars' worth of coverage. Even if she had the coverage, it wasn't going to be adequate, so she could end up winning this and still face an excess judgment from the Moors. So we tried to triangulate a settlement between the Moors, FPIC, and MedPro to protect Dr. Sutton at the end of the appeal. The FPIC said no deal. It did. First we went to the Moors and we said, will you stay the case, stay the tort action, and waive your claim for an excess judgment if, that is, stay the case and agree to limit your recovery to a million dollars, if we can get the insurers to agree to pay you their coverage at the end of the appeal? Whoever ends up with it, if they'll agree to it. Both policies are a million. Yes, both policies are a million. Whoever gets the coverage, will you agree to stay the case and waive an excess judgment if they'll agree to do that? And the Moors thought about it for a while, and they said, well, what happens if it comes back as a dog fault and there's no coverage at all? We're not willing to stay the case in that event. We want a guarantee of a low. And they wanted a guarantee of a low, and they gave us a figure. So we went to MedPro and FPIC and said, look, the Moors have agreed to stay the case, and they've agreed to waive an excess judgment against Dr. Sutton, but you have to agree to pay the coverage, whichever one of you has the coverage, you have got to agree to pay the coverage to the Moors without the need and expense and the delay of a malpractice case. And in the event that there's no coverage, the Moors want to be guaranteed a floor, a bottom. Well, MedPro agreed. MedPro said, okay, we'll do it. We'll go ahead and we'll protect. And this was really in Dr. Sutton's best interest, and I think MedPro did the right thing by saying, all right, if the appeal puts the verdict or the judgment, the obligation to provide insurance on MedPro, we'll pay the limits. And if it turns out that there's no coverage at all, we'll agree to pay the floor, the bottom. FPIC refused. Well, as it was, Dr. Sutton had no choice anyway but to appeal. So the issue is ripe before us, and that is who's going to have the coverage? This case began as a declaratory judgment action. It continues as a declaratory judgment action. So we clearly have jurisdiction over Dr. Sutton's appeal? Yes. Unquestionably. I think you have jurisdiction over the entire thing. Well, yeah, but, I mean, what's unquestionably with regard to Sutton versus FPIC, FPIC is not a party to any agreement. That's correct. Okay. By the way, are you provided to Dr. Sutton by FPIC under a reservation? No. No? No. MedPro. MedPro? MedPro under a reservation. All right. Today Dr. Sutton asks only we're happy with the verdict as it is, but Dr. Sutton asks that if this court determines that her call to MedPro. You're happy with Judge Gergel's ruling? We are. We are. But if this court determines that her call to MedPro did not constitute the report of a potential claim, that it also rule that it did not constitute a prior report of a medical incident as to FPIC, so as to invoke their coverage. We think it necessarily follows that because if this court concludes that it didn't constitute. You think there's no logical gap there at all? That's correct. It's a zero-sum game from your perspective. That's correct. We believe that Judge Gergel's, in fact, we think that FPIC owes the coverage. Judge Gergel's mistake, and it was an error of law, I think, was his ruling that the insured's personal knowledge or intent is not relevant to the prior reporting exclusion. Judge Gergel said that Dr. Sutton's knowledge or intent is not relevant to the exclusion. Well, the reporting of a medical incident. Is that 11B or 11C? That's B. Pardon? B. B. Okay. The reporting of a medical incident has two elements. First, it requires knowledge of a medical incident, and second, it requires the deliberative act of communicating that knowledge to somebody else. If Dr. Sutton had no knowledge or reason to know of a medical incident, she could never have deliberately reported it to a prior carrier. And in this case, not only did she testify that she had no reason to know. The request for medical records comes in all the time. She had no reason to know. There was no evidence presented by FPIC or anybody else that Dr. Sutton should have known. And what is a medical incident? A medical incident is an accident. An accident. Yeah. It's an accident. It's not just a birth or an operation. No, it's an accident. It's defined as an accident. Well, I say accident. Act or omission. Act or omission. Now, it's important to note that Judge Gergel did not so much find, it's interesting, he didn't so much find that Dr. Sutton reported a medical incident as he found that her call gave MedPro sufficient information to put them on inquiry of a potential claim. You're going to probably be the only one to defend this between the parties. Is it strict compliance or substantial compliance? I think that's the issue, and I think it's strict compliance. I hate to say that because I'm a plaintiff's lawyer and I represent people all the time trying to get coverage, and I'd like it to be substantial compliance. But I think the rule is strict compliance. When one is invoking coverage,  our courts have held that strict compliance must be met. Anyway, what Judge Gergel said was, well, here's the thing. He said that her call put them on inquiry notice. The FPIC policy does not exclude claims if the insurer has given a prior insurer information which was sufficient to put them on inquiry notice, which if they then pursued would give them reason to believe there's a potential claim. There's a difference between constructive notice and actual notice. The FPIC policy excludes actual notice. It does not say we exclude coverage for anything that might have been constructive notice by the insurer. And I think that's where the real problem was. Judge Gergel expanded the language of he rewrote the FPIC policy. Well, can he do that? I mean, that's one of their contentions is that he rewrote the policy. He did. I think he rewrote the policy for purposes of putting it on MedPro instead of FPIC. Is that a legal error? Yes. But he dealt with 11B. That's right. What about 11A and 11C? Well, both those require cognition. In fact, FPIC talks about all of these exclusions as being a prior knowledge exclusion, and that means that they require cognition. And it folds back into the same question. Did she know or have reason to know of a potential claim? Her testimony was not challenged. She had no reason to know and did not know of a potential claim. There was no testimony that was offered that would have invoked A or C. FPIC offered no testimony that, boy, under these circumstances, Dr. Sutton, with this medical record and under these circumstances, Dr. Sutton shouldn't have realized there was a potential claim. There's nothing of that in there. Dr. Sutton testified that she had no reason to know of a potential claim. This is an event that happened four years before she received the request for medical records. She had no recollection of who these people were or what had happened. The only thing that she knew, and this was once she understood who the Moors were, is that there had been a difficult birth with a good result afterwards. Anyway, we think that Judge Gergel got it wrong. We believe that it ought to be on FPIC, but we're happy with it on MedPro. You don't think, if we agree with you on the 11B, do we not have to send it back to have the rest of the exclusions considered? That's a good question, but I don't think that you do, because they all require a recognition of an incident. 11B requires knowledge of an incident and then the deliberate reporting of the incident. 11A requires knowledge, that is, you know or should have known of the incident, and since there was nothing in the record, to show that Dr. Sutton had reason to know of a potential incident, no, you don't have to send it. So we'd be ruling that you have coverage? Yes. Under the FPIC? Under the FPIC, plausible. So you're saying we can decide the 11A and 11C exclusion? That's correct. That's the only way that 11B was decided? Yes. And if you have coverage with FPIC and we were to uphold Judge Gergel, what's the effect? Unfortunately, it goes back to trial. It goes back to the malpractice trial, because FPIC refused to agree with the Moores to protect Dr. Sutton. Now Dr. Sutton is out there facing a malpractice case by the Moores. I believe that because FPIC refused to agree to protect Dr. Sutton with this declaratory judgment appeal, that FPIC is really on the line under what we call the Tiger River Doctrine for any judgment that comes down the pike. That'll be the third lawsuit. That'll be the third lawsuit. That's right. But hopefully it will resolve if FPIC gets the coverage. Hopefully FPIC will see and the Moores will agree to release Dr. Sutton and pay the coverage. All right, sir. Thank you. Mr. Salani. Thank you, Your Honors. I represent First Professionals, or FPIC. Let me make one thing clear. First Professionals, at least through me, was never invited to join in any high-low agreements with regard to the underlying case. What happened was that prior to Judge Gergel's decision, there was a suggestion of coming together and paying something less than the coverage on one policy split between FPIC and MedPro. MedPro wanted a 50-50 share of that, and that was declined. Then after the decision was rendered, I received a call from MedPro's attorneys suggesting that they would forego the appeal if we would go ahead and participate in making a 50% contribution to the claim. What had happened until that time is that First Professionals had defended Dr. Sutton all the way through the underlying case. They had made a tender to MedPro, who had disclaimed coverage and said, we have no obligation. Then when Judge Gergel's order was entered, they assumed the defense and requested a period of time to examine the facts of the underlying case to make a determination if they were going to make a settlement. When they made a determination to make a settlement, which is apparently this high-low thing, they invited us to participate to the extent of paying 50% of what they had agreed to pay. I will tell the Court that at that time it was not discussed on the basis of a high-low. It was simply, you pay 50% of what we can negotiate. That's the participation. The second thing, we have a horrible result from this delivery. Two things are important in terms of that result. One, even Dr. Sutton herself testified that this was, of a handful of cases, probably the worst result that she ever had. That is to say, in the bottom 1% of the thousands of deliveries that she had. True, she also testified that at the time she received the letter from St. Francis, she didn't recognize the name Amy Moore. She didn't understand what that was about. She was, however, concerned enough to pick up the telephone to call and read that letter to a MedPro representative. Well, tell me, Mr. Salini, how the call or the letter triggers that medical incident language in the policy. Amy? Yes, sir. It seems to me Judge Gerlo conflated some issues. Well, here's how it triggers it. Let me first of all say that when we get the arguments from the other side in their briefs, they flip back and forth from medical incident to potential claim. You'll note that medical incident is part of the definition of a potential claim. But medical incident itself is the underlying treatment of the patient that may or may not give rise to that potential claim sometime in the future. What we have is a situation when that telephone call was made, the substance of the letter, and I think this letter, you can read it for yourselves, I think it's been mischaracterized by the other side, but the letter is from the Risk Management Department of St. Francis Hospital, and they say that they routinely review requests from attorneys for medical records to identify potential claims that occur within their health care system. And as a courtesy, they're notifying Dr. Sutton that this request was made. They have segregated the records, and they invite her to come and review the records or obtain a copy. Now, anybody would know from looking at the records, and Dr. Sutton would have known had she remembered what the circumstances were of the delivery of this child that she was facing a potential claim. But in any event, by reading this letter to the adjuster or to the person that she spoke to at MedPro, she would have identified the patient's name, she would have identified the date of treatment, June 23, 2004, and she would have said that the hospital risk management people have taken a look at this. And she has now identified a medical incident. Even Dr. Sutton says that had she connected the dots in her own mind, she would have reported this as a potential claim. She would have reported on her renewal application. Joe Costi said that if she had received this letter or knew the contents of this letter, he would have immediately gone and obtained the medical records. From looking at the medical records and what he'd heard at the trial and seen that were put into evidence, he would have known that this was a potential claim, and he would have set up a claim file. The purpose of reporting a medical incident is to put a flag for a claims-made policy so that if a claim develops, it is associated back to that policy period because the claim has first been reported during that policy period, and it's covered. Going back to my question. Yes, sir. Your policy uses a medical incident, and it's defined as an act in the providing of professional services to a patient. Now, how does that letter constitute an act of providing professional services or, for that matter, the telephone call? All right. It does not specify what the act was. It specifies that there was an admission during which the doctor treated this patient during this period of time. We think that's sufficient to establish the reporting of a medical incident. If you will go back, this was not Dr. Sutton's first case, and it's not been her last case, but you'll recall the testimony that was given during the course of the trial about the Arrington file, which was started by an attorney request for records. She received a request for records from a client, from a patient, in which there had been a bad result. She immediately forwarded those to or through her office staff, forwarded that to MedPro. MedPro had requested additional medical records and evidence, and that they had, when they reviewed those additional records and evidence, immediately converted the reported incident into a claim, and it became a claim which was settled through mediation and actually was settled one month before she received this letter from St. Francis. So what I'm saying is that the record fully demonstrates that this is the kind of thing which can trigger a report that establishes or creates an incident that produces an investigation that leads to ultimately a claim. And I think that's all that Judge Gergel was saying. Now let's see what they argue is that a medical incident requires some cognition or knowledge that you're going to be sued. I would submit to you anybody who received the letter that she received from St. Francis would think that there is a potential she could be sued as a result of that hospitalization and treatment of Amy Moore. Also note that the treatment of Amy Moore, referenced Amy Moore, refers not only to the mother in an OB-GYN situation or obstetrical situation, but also the fetus of the infant. It's not unusual that they didn't put Nathan Moore's name there. She wouldn't have recognized Nathan Moore because the infant at birth had no name. All of their records are kept under the mother's records until the pediatrician takes over the handling of the case. Judge Floyd, have I answered your question about the... Well, you all come up here and ask us to strictly construe your policy language, and I'm trying to get to how that call or that letter is an act under your policy and, for that matter, under MedPro's policy. Let me be specific as to what it says. The execution says we will not defend or pay damages under this coverage part for any injuries or damages arising out of a medical incident which, prior to the effective date of this policy, was reported to an insurer, a pending claim or proceeding, or a paid claim. And all they're talking about there, Your Honor, is not that you're reporting a medical incident. You're reporting the potential for damages being assessed that arise out of a medical incident, that is, the treatment of a specific patient, which you had reported to a prior insurer. And reported to a prior insurer means that you have communicated this as an incident worthy of the notice or notification requirements under another insurer's policy. The thought is that that 11B, along with 11A and 11C, represent three distinct different areas, all of which indicates an insurer's prior knowledge that there's something here that needs to be reported. So you agree or disagree with the other side that there should be substantial compliance or strict compliance? You know, in terms of the issues between Dr. Sutton and MedPro, I have taken a position that that's between them. It does not affect the coverage under my policy. When he talks about strict compliance, they're talking about whether or not the report had to be accompanied by all of this other falderal, my term. But all the other information, including the medical records, names of witnesses, identity of what happened and transpired. The answer is those are illustrations of the kind of information the company wants. I don't think those are illustrations of what the company requires in order to have a reported claim. Could you tell us one more time . . . Will you finish responding to Judge Floyd? I think so. I'm struggling with this definition of medical incident. And your definition, your characterization of it from the one I heard in the prior argument. And I'm looking at the definition. Mr. Cofallo said it was an accident. But I don't see any indication. It says act, error, or omission. Am I reading that correctly? You're reading it perfectly right. Any act, error, or omission in the provision or providing of or failure to provide professional services to a patient. And so what they're asking for is when you're reporting a medical incident, they're asking for you to report any act, error, or omission with regard to the providing of your professional services. And that is, here's a problematic area of the provision of professional services. Now, truthfully, Dr. Sutton, in terms of her own cognition, had she connected the dots based on information she had or had at her disposal, would have made that cognitive link. She just didn't connect the dots, either because of the passage of time, the four years between the delivery or the thousands of deliveries she had between those periods of time. But she just didn't make that linkage. Well, the fact that she subjectively doesn't make that linkage, we submit, doesn't make that not a report of either a medical incident or a potential claim. And as you say, medical incident is a constituent of potential claim. That's correct. Potential claim means acts, error, omissions, or circumstances which an insurer knows or could have reasonably foreseen from the facts, reasonable inferences, that a claim for a medical incident might be made. And it includes expressly records requests by attorneys. So a records request by an attorney under circumstances with a bad result is in and of itself a medical incident. And that's what she reported. So your bottom line is Judge Gergel got it right. Even if he had a few missteps along the way. I don't even know that he had any. You don't think he had any? The only misstep he had was probably that I would argue was not granting the summary judgment. But in retrospect, I understand that he was bound by the conventions of summary judgment to construe things differently or adversely to a position. And he had a credibility determination that he had to make. And as Judge Gergel said, he said, this case essentially rises or falls on the credibility determination of Dr. Sutton saying, I got this letter. It was so unusual. I've never had one before. I've never had one since. That I sat down and I called my company, MedPro, and I reported this to them. I gave them, I essentially read this letter to them over the telephone. And we consider that to be a report of a medical incident. Had that been done to MedPro, we would have considered that to be a report of a medical incident. Without question. And Mr. Cosley seems to agree. Oh, yes. He said that had this gotten to me, I'd have recognized it for what it is. And had I seen the medical records, even just four pages of the medical records, and known that the infant had APGAR scores of 1, 2, and 2 at 2 minutes, 5 minutes, and 10 minutes, I'd have known. It would have become a claim. It would have been investigated. And that's the point. That's the whole point. The final point I want to make is that with regard to 11A and 11C, the court just did not decide those issues. If you were to reverse on 11B, we still have to go through or have somebody make a determination on 11A and 11C. Mr. Cavallo said we could do that very easily. Well, that would be fine with me if you got the record and want to accept the credibility determinations. If there are no more questions. Well, I've got 56 seconds. I saw the red light. The red light's on. That means I think you're 56 seconds past it. Oh, well, then I'm in a deficit. I apologize. If you have something else you want to say, I've been very loose here. No, sir. That concludes my argument. Thank you very much. Ms. Rickhammer? Thank you, Your Honors. I'm going to defer, I hope, to Mr. Cavallo on the statement about the high-low. I was not directly involved in those discussions with first professionals. My understanding is that they were given the same opportunity my client was, but that's all I wanted to say on that point. I think to be brief and try to keep within the three minutes, because you've heard a lot from me today, I'm going to direct you on the point about strict construction of a policy. We think it's the vast, overwhelming majority view in this country, fully consistent with South Carolina law, that you strictly construe the notice requirements in a claims-made policy. And I'll direct you to pages 26 and 30 of our brief that I think succinctly sets forth those authorities and the arguments that the lack of a purposeful, deliberative report is fatal. It precludes a later claim to come back and try to characterize something as a potential claim. I also want to point out to Your Honors, it's another case we do cite in our brief, which is the Bryan Brothers case in this court from 2011. It is a published decision, originally unpublished, but it became published. That was a case arising under Virginia law, fully consistent with the law of South Carolina, where this court strictly construed a condition precedent to coverage, in that case, related to prior knowledge. And I would submit to you, Your Honor, that when you have words in an ensuring agreement, the only reasonable interpretation is strict construction, whether those words relate to notice of a potential claim, or as in Bryan Brothers, relate to a condition of lack of prior knowledge. So I would refer the court to that decision, I think, will be very instructive in understanding why Judge Gergel essentially skipped over the analysis that's required, we believe, under South Carolina law. And I'll also, as rebuttal, point out that essentially this case rests upon a series of suppositions. Had she reviewed the records, she would have recognized a potential claim. Had she connected the dots with her own memory, she then would have reported it to MedPro as a potential claim, or disclosed it on her application to first professionals. Had she gotten in touch with Joe Costi, he would have taken a series of steps, eventually gotten the medical records, and be in a position to recognize there might be a claim there on the bottom of the chart. None of those things happened, and none of them happened, and that is undisputed. Those are the undisputed facts on the record. Those are the undisputed facts that bar that – I won't say they don't bar coverage under the medical protective policy. It means there's no coverage under that policy. They don't meet the requirements of the insuring agreement. If you take away the requirement for a purposeful, deliberate act of giving notice, you are writing the insuring agreement out of the policy and giving her a new insuring agreement. And the last point I would make, Your Honor, on standing, if there continue to be, after this argument, questions in your mind about it, I would ask for the opportunity to submit a short brief statement of authorities that we believe would submit our position that they're standing both on the MedPro side of the appeal as well as on the first professional side of the appeal. So my time is up unless Your Honors have additional questions for me. Thank you very much for the opportunity. And to me and my clients, thank you. Thank you. Mr. Cavalli. I have only a couple of observations. Tom Salaney is a good friend, and I've known him for years, but his recollection that FPIC was not offered an opportunity to participate is not correct. I have the correspondence in my file. Well, it may turn out that that's a good thing that they didn't participate because, you know. More litigation. I'd rather avoid the litigation. But, I mean, in terms of our jurisdiction, that seems to clinch it. Okay. Okay. Perhaps not, but it seems to. As far as Mr. Salaney made a comment that Dr. Sutton testified that this was the worst result ever, well, ten years later, at the trial of this case, after she's had an opportunity to review the records, she said this was a bad result, this is a bad baby. But at the time she reported, at the time she received the inquiry or the notice of the medical records, she had no idea of that. As far as Judge Floyd, you asked about how does this request for medical records give rise to notice of a medical incident. That's a good question because the testimony from FPIC and MedPro at trial was that the receipt of a request for medical records standing alone is not notice of a potential incident, medical incident, or a potential claim. What Mr. Salaney is doing is he's confusing or jumbling two exclusions. As far as the reporting of a medical incident, it has nothing to do with a request for medical records. That's B. Under A, Dr. Sutton, FPIC won't provide coverage if, from all the circumstances, Dr. Sutton knew or should have known that there was a potential medical incident. And the circumstances that are listed, there are several things, include a request for medical records. So the request for medical records comes in as an indicia of one of the things ought to be considered to know whether she had the subjective knowledge. Did she know or have reason to know of a potential claim? It has nothing to do with Exclusion B, which is the reporting of a medical incident. And as far as the issue about whether she knew or had reason to know of a potential claim, I remind the Court that all of the testimony was uncontradicted. There was nothing to give Dr. Sutton reason to know that there was a potential claim. It was a bad result. We didn't know about that. She didn't know about that until nearly 10 years later. That's all that I have. Thank you. Thank you. Thank all of you. And we're going to come down and greet counsel and take a short break. This Honorable Court will take a brief recess.
judges: Robert B. King, Henry F. Floyd, Andre M. Davis